

AO 106 (Rev. 04/10) Application for a Search Warrant

FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

13148 Wenonah Drive SE, Apt D
Albuquerque, New Mexico, 87123,
Single Family Residence

)
)
)
)
)
)

Case No.        **23mr1912**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, attached hereto and incorporated herein.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2339B(a)(1) | Attempt to Provide Material Support to a Designated Foreign Terrorist Organization; |
| 18 U.S.C. § 1512(c)(1) | Tampering With a Witness, Victim, and Information. |

The application is based on these facts:

See Affidavit, attached hereto and incorporated herein.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Redmond Ott, Special Agent
*Printed name and title*

Sworn telephonically and signed electronically

Date: 10/11/2023

*Judge's signature*

City and state: Albuquerque, NM

B. Paul Briones, US Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: The premises located at **13148 Wenonah Drive SE, Apt. D, Albuquerque, New Mexico, 87123,** a single-family residence | Case No. _____ <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Redmond Ott, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since January 2018.  Among other things, I am responsible for conducting national security investigations of potential violations of federal criminal laws as a member of the Joint Terrorism Task Force ("JTTF").  During my tenure as a Special Agent, I have participated in numerous criminal and national security investigations.

2.      In my capacity as a Special Agent, I have received training and gained experience in search and seizure, the use of confidential human sources, electronic and video surveillance, international and domestic terrorism, drug offenses, violent crimes, computer crimes, money laundering, fraud, Indian Country crimes and various other crimes.  As a result of my training and experience, I am familiar with the tactics, methods and techniques of terrorist networks and their members, including the use of computers, cellular telephones, social media, email, and the internet in connection with criminal activity.

3.      This affidavit is submitted in support of applications under Rule 41 of the Federal Rules of Criminal Procedure for a search and seizure warrant to search the residence located at

13148 Wenonah Drive SE, Apt D, Albuquerque, New Mexico, 87123 (hereinafter, the "Target Residence"), as more particularly described in Attachment A to seek the items described in Attachment B.

4.      As described in detail below and the evidence gathered to date in this ongoing investigation, I submit there is probable cause to believe that Wilson has committed the following crimes: attempting to provide material support or resources (as that term is defined in 18 U.S.C. § 2339A(b)(1)) to a Foreign Terrorist Organization ("FTO"), namely, the Islamic State of Iraq and ash-Sham, which has been designated by the Secretary of State as an FTO pursuant to Section 219 of the Immigration and Nationality Act, in violation of 18 U.S.C. § 2339B; and Obstruction of Justice, in violation of 18 U.S.C. § 1512(c)(1) (hereinafter, the "Subject Offenses"). There is also probable cause to believe that evidence, fruits, and instrumentalities of those crimes will be found in cellular telephones or "smart" telephones at the Target Residence.

5.      The information in this affidavit is based upon my training and experience, my personal knowledge of this investigation, and information provided to me by other Special Agents and law enforcement officials who have assisted in this investigation and have experience investigating international terrorism and national security matters.  In submitting this affidavit, I have not included each and every fact known to me about the investigation, but instead have included only those facts which I believe are sufficient to establish the requisite probable cause.  All conversations and statements described in this affidavit are related in substance and in part only unless otherwise indicated.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A).   Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

## RELEVANT LEGAL AUTHORITY

7.      Title 18, United States Code, Section 2339B makes it illegal for anyone to attempt or conspire to provide material support or resources to a designated FTO.  For purposes of Sections 2339B, "material support or resources" is defined as:

> any property, tangible or intangible, or service, including currency, monetary instruments or financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself) and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

8.      Title 18, United States Code, Section 1512 makes it illegal for whoever corruptly alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding. 18 U.S.C. § 1512(c)(1).

I.      **Background of ISIS**

9.      On October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.  On May 15, 2014, the United States Secretary of State amended the designation of AQI as a FTO under Section 219 of the INA and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and ash-Sham (*i.e.*, "ISIS" – which is how the

FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla ash-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, ISIS. To date, ISIS remains a designated FTO.

## **PROBABLE CAUSE**

10.     Herman Leyvoune Wilson, Jr. ("Wilson") is a forty-six-year-old convicted felon. In 1995, Wilson was convicted on a New Mexico state charge of armed robbery and sentenced to a term of 13 years imprisonment. In 1997, Wilson was convicted on New Mexico state charges of armed robbery, conspiracy, kidnapping, and possession of a firearm by a felon and sentenced to 18 years' imprisonment. In 2017, Wilson was convicted in the United States District Court for the District of New Mexico of a violation of 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm, and sentenced to 33 months' imprisonment and three years' supervised release. Following that conviction, Wilson was on supervised release until November 13, 2021.

11.     On August 23, 2022, a grand jury in the District of New Mexico indicted Wilson for attempting to provide material support and resources to a designated FTO, ISIS, in violation of 18 U.S.C. § 2339B, and tampering with a witness, victim, and information, in violation of 18 U.S.C. §§ 1512 (c)(1) and 2(a). On August 26, 2022, Wilson was arrested pursuant to the indictment and an arrest warrant. Since his arrest, Wilson has been detained pending trial.

12.     Between May 2019 and September 2020, Wilson helped to administer an online group (hereinafter, "Private Encrypted Group 1") through an encrypted application (hereinafter, "Application 1"). The purposes of Private Encrypted Group 1 were to promote ISIS ideology, to recruit others to ISIS's ideology (which Wilson referred to as the "prophetic methodology") and

to discuss ISIS and other terrorist attacks in the United States and overseas. Wilson also used Private Encrypted Group 1 to promote and find potential like-minded individuals to join a mosque Wilson planned to form, called the Islamic State Center of New Mexico, in Albuquerque. A confidential human source ("CHS1")[1] posed as a member of this group and had in-person meetings with Wilson and other group members from approximately January 2020 to November 2021.

13.     In September 2020, Private Encrypted Group 1 members Kristopher Matthews and Jaylyn Molina were arrested in Cleveland, Tennessee and Cost, Texas, respectively, on charges of conspiring to provide material support to ISIS and attempting to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, in part for conduct they engaged in on the encrypted application through a subgroup, which Wilson was not a part of, which included detailed planning for jihadist attacks and sharing of instructions on how to make and use explosive devices. Matthews and Molina were prosecuted in the Western District of Texas and pleaded guilty and were sentenced to 20 years and 18 years of imprisonment, respectively. Through separate interviews of Matthews and Molina, both admitted to the FBI that Wilson radicalized them to ISIS's ideology, and that without Wilson's influence, they would not have committed the crimes to which they have pleaded guilty.

14.     After Matthews and Molina were arrested for conspiring to provide and attempting to provide material support to ISIS, Wilson instructed Private Encrypted Group 1

---

[1] CHS1 began working as an FBI source in approximately February 2010. As of approximately June 2022, CHS1 had received about $784,604 from the FBI in connection with CHS1's work. CHS1's reporting is assessed to be credible, as it was corroborated by other investigative means, including recordings.

platform users to destroy evidence of their use of the platform.  Wilson then established and used a second encrypted online group, hereinafter Private Encrypted Group 2, whose purposes were the same as those of Private Encrypted Group 1.  This conduct forms the basis of the obstruction of justice charge against Wilson that is referenced above.

15.     In a recorded in-person discussion between Wilson and CHS1 that occurred on October 24, 2020, CHS1 indicated that CHS1 was purportedly assisting ISIS by providing photographs of U.S. military installations, to which Wilson told CHS1 about Kirtland Air Force Base in Albuquerque, New Mexico.  Wilson and CHS1 drove together in the same vehicle, and Wilson directed CHS1 to drive to the base.  There, Wilson described the normal entry methods to the base, and showed CHS1 how "easy" it was to get on the base.  Wilson also suggested that CHS1 find a woman with access to the base in order to assist CHS1 in getting photographs and access.  Wilson suggested that there were nuclear assets on the base and also told CHS1 about a National Guard facility in Albuquerque where CHS1 could take photographs. Wilson then drove CHS1 to the National Guard facility.  The following day, in a recorded in-person meeting, Wilson advised CHS1 of a transportation hub in Albuquerque that houses bus lines and rail lines. Wilson offered CHS1 advice on how to take the best pictures of the transportation hub believing that CHS1 would also provide this information to ISIS.

16.     On January 12, 2021, in a recorded in-person meeting, Wilson told CHS1 that he intended to email *Arkan* magazine, an ISIS-affiliated publication in Myanmar, about the establishment of his mosque in hopes of securing financial support for Wilson's mosque. According to CHS1, on March 12, 2021, Wilson emailed what he believed to be *Arkan*, asking for advice, networking services, and funding, claiming to represent Muslims who subscribe to

ISIS ideology and that the mosque he intended to create would help ISIS to identify true believers and assist individuals who wished to travel and fight for ISIS.

17.     From May 2021 to August 2021, Wilson hosted a series of meetings in Albuquerque to organize and rally pro-ISIS individuals to engage in jihad, to further support ISIS, and possibly to engage in martyrdom. Members of Private Encrypted Group 2 attended these meetings.  and discussed, among other things, attacks on law enforcement, acquiring firearms, killing imams[2] who do not support ISIS, and inspiring others to wage jihad. According to CHS1, at one such in-person meeting, held over several days from May 9 to May 12, 2021, Wilson officially swore his allegiance to the "Khalifah" of the Islamic State on camera. Wilson gave an oath of "bay'ah" or "loyalty" to Abu Ibrahim al-Hashimi al-Qurayshi, the leader of ISIS at that time. Wilson gave CHS1 his cell phone in order to record Wilson's bay'ah oath, which Wilson then made wearing formal dress. After CHS1 video recorded Wilson's bay'ah, CHS1 returned Wilson's cell phone to Wilson.

18.     According to CHS1, at another such in-person meeting, which was recorded, and took place from July 18 to July 21, 2021, Wilson emphasized the importance of learning to work as a unit when fighting and explained that airsoft[3] training could help prepare for the battlefield. Wilson also told CHS1 that he has created for himself several notebooks of different types of fighting techniques, such as boxing, martial arts, and grappling techniques. Wilson drew diagrams on a white board for those at the meeting to explain how to conduct L-shaped and

---

[2] An Imam is an Islamic leadership position and for Sunni Muslims, Imam is most commonly used to refer to the worship leader of a mosque.

[3] An "airsoft" gun is a simulated weapon which fires non-lethal projectiles instead of bullets. This weapon is legal to possess, even for convicted felons.

linear ambush techniques.  Wilson also instructed the group on how to use pressure points to inflict pain and how to "choke people out."

19.     According to Wilson's U.S. Probation Officer, Wilson was terminated from supervised release on November 13, 2021, and received a letter from U.S. Probation on November 15, 2021, informing Wilson that he satisfactorily completed all conditions of supervision and has no further obligations.  The letter was addressed to Herman Leyvoune Wilson at the Target Residence.  On November 17, 2021, under the direction of the FBI, CHS1, in a recorded meeting, informed Wilson that CHS1 was making hijrah.[4]  Wilson indicated an intent to provide CHS1 with training to prepare CHS1 for hijrah and suggested that CHS1 stay at Wilson's house in order to receive such training.  CHS1 met Wilson at the Target Residence on November 17, 2021.  CHS1 informed Wilson that CHS1 would soon be purportedly making hijrah to Egypt to engage in jihad on behalf of ISIS.  CHS1 also told Wilson that everything done from that day on was to prepare CHS1 for the journey and mission.  Subsequently, Wilson made several comments to CHS1 acknowledging Wilson's understanding that CHS1 was traveling to fight on behalf of ISIS, such as that CHS1 would need to get used to the smell of dead bodies, and Wilson specifically mentioned Egypt and the Sinai Peninsula.

20.     Later on November 17, 2021, in a recorded meeting, Wilson drove CHS1 to a store to purchase tactical equipment, including a vest, goggles, face coverings, and camouflage clothing—all items that would be needed by CHS1 as a fighter for ISIS.  Wilson lent CHS1 one of his airsoft rifles, an airsoft AK-47, and told CHS1 to get used to that particular weapon for all upcoming trainings because that was likely the same type of weapon that ISIS would provide

---

[4] While hijrah generally means "migration," in this context of ISIS, "hijrah" is a term specifically intended to refer to traveling overseas to fight on behalf of ISIS.

CHS1 in Egypt. At the Target Residence, Wilson trained CHS1 in proper shooting stances with an airsoft rifle, individual movement techniques, the importance of a unit protecting its flanks from attacks, and the importance of physical conditioning for combat.

21.     On November 18, 2021, at the Target Residence, in a recorded in-person meeting, Wilson showed CHS1 various ISIS battlefield videos and videos of ISIS fighters beheading and executing people. Wilson also shared with CHS1 a battlefield training manual Wilson had authored, with combat techniques Wilson taught CHS1. Wilson, however, kept the battlefield training manual as Wilson advised that he had not finished the manual.

22.     Wilson and CHS1 checked into a short-term rental in Albuquerque, New Mexico later that same day. There, in a recorded meeting, Wilson instructed and critiqued CHS1 on room clearing, urban combat, and close-quarter combat. Wilson told CHS1 that the training CHS1 received from Wilson was to make sure CHS1 would survive in battle, be able to carry out CHS1's mission, and then come home.

23.     On November 19, 2021, the third day of their meeting, in a recorded in-person meeting at the short-term rental, CHS1 told Wilson that CHS1 had purportedly received orders that instructed CHS1 to go to the bus station on the evening of November 20, 2021. Wilson then drove CHS1 in his vehicle to the bus station in Albuquerque to show CHS1 where it was and further offered to take CHS1 to the bus station when it was time for CHS1's final departure from the United States.

24.     During the same day, in a recorded in-person meeting, Wilson also told CHS1 about a time when Wilson first shot at people when Wilson was in a gang. Wilson said he was scared but eventually got used to it. Wilson told CHS1 that shooting people is like fighting; at first you are nervous, scared, and uncomfortable, but eventually you get used to it and it becomes

easier.  Wilson told CHS1 to control CHS1's emotions in Egypt because it would be easy for

CHS1 to kill with an AK-47 in CHS1's hands.  That day, Wilson continued the training with

CHS1 by practicing knife combat techniques with a 5-inch blade so CHS1 would be prepared to

engage in hand-to-hand combat on the battlefield.  During this training, Wilson inadvertently

punctured CHS1's leg with the knife and drew blood from CHS1.

      25.     On November 20, 2021, the fourth and final day of their meeting, in a recorded

in-person meeting at the short-term rental, Wilson instructed CHS1 in more hand-to-hand

combat techniques.  Wilson and CHS1 later went to an airsoft practice facility to continue

weapons handling lessons and they conducted a simulated battlefield experience.  Wilson and

CHS1 later returned to the Target Residence, with Wilson's airsoft rifles, after finishing airsoft

training.

      26.     Later that day, at the short-term rental, in a recorded in-person meeting, Wilson

told CHS1 about a new business venture Wilson wanted CHS1 and Wilson to pursue together.

The business venture would entail CHS1 selling airsoft guns and equipment in Egypt with the

goal of assessing and recruiting Egyptian youth.  It would also entail training ISIS fighters with

Wilson personally joining in when Wilson would travel to Egypt.

      27.     On November 20, 2021, in a recorded in-person meeting at the Target Residence,

Wilson showed CHS1 clips of war movies so CHS1 could get a glimpse of what the battlefield

would be like before CHS1 made the journey overseas.  Soon after, Wilson drove CHS1 in his

vehicle to the bus stop and told CHS1 to let Wilson know via Application 1 (an encrypted

messaging application) when CHS1 was "headed home," which meant CHS1 was purportedly en

route to Egypt, and then when CHS1 had "arrived at home," which meant CHS1 notionally

arrived in Egypt.  Based on my training and experience, including my experience related to the

investigation of Wilson, I believe this demonstrates Wilson's intent to continue to use his electronic devices to maintain communications through encrypted messaging applications.

28.     After November 21, 2021, Wilson continued to be active on Application 1 and also administered Private Encrypted Group 3, a third encrypted online group whose purposes were the same as those of Private Encrypted Group 1 and Private Encrypted Gorup 2 and which included many of the same members.

29.     On July 4, 2022, I observed a screenshot from Application 1 user Bilal, with a profile picture that resembled Wilson, who said he heard that brother Ali[5] (Matthews) was sentenced to 20 years.  Subsequently, Bilal (Wilson) posted "Subhanna Allaah, may we always keep him in our dua [prayer]."

30.     On August 26, 2022, the same day Wilson was arrested, a search warrant was executed on Wilson's person (22-MR-1274), the Target Residence (22-MR-1275), and Wilson's vehicle (22-MR-1276).  Among the items seized from the Target Residence were three of Wilson's cellular phones.  These three seized phones were the only phones located during the August 26, 2022 search of the Target Residence that (1) were turned on; (2) not believed to belong to Ashley Martinez ("Ashley"), Wilson's live-in girlfriend and the mother of his children; and (3) believed to be currently in-use by Wilson.  During that search, the FBI also located but did not seize additional cellular phones that were stored in the Target Residence but not turned on or believed to be used by Wilson at that time.  In addition to seizing the three phones referenced above, FBI personnel seized six airsoft rifles, an airsoft pistol, Wilson's training

---

[5] Based on my experience in this investigation, I am aware that "Ali" is the alias used by Kristopher Matthews.

manual (which Wilson had shown CHS1, as described above), numerous notebooks and binders, and a painting of the 9/11 World Trade Center terrorist attack that Wilson had painted himself, among other items. The seized notebooks contained, among other things, a list of ISIS leaders, pages appearing of what appeared to be Wilson's combat manual, and a list of ISIS governmental departments.

31.     FBI personnel also located and searched a safe in Wilson's bedroom in the Target Residence on August 26, 2022. The safe was approximately three feet tall and positioned next to the bed. It was covered by a blanket but unlocked. At the time of the search, the safe contained, among other items, a notebook, two ISIS flags, and receipts for ISIS flags Wilson had sold to other individuals—all of which were seized—but the safe did not contain any cellular phones or other electronic devices.

32.     The contents of the three phones seized from the Target Residence on August 26, 2022, were extracted by FBI personnel at the New Mexico Regional Computer Forensic Laboratory ("NMRCFL") in Albuquerque, New Mexico and a review of those phones' contents resulted in the discovery of evidence and instrumentalities of the Subject Offenses, including Wilson's online communications regarding ISIS, but the video of Wilson pledging his bay'ah to ISIS, recorded on Wilson's phone in May 2021, was not located. Based on my training, experience, involvement in this investigation, discussions with other law enforcement officers, and review of records obtained during this investigation, I believe the bay'ah video could be saved on one of Wilson's older phones, including those phones not seized during the previous search warrant that could have been Wilson's phone during the time of the bay'ah recording.

33.     Recently, the FBI reviewed recorded jail calls made by Wilson while in confinement awaiting trial.  During a recorded jail call on December 20, 2022, between Wilson and Ashley, Wilson brought up the topic of cellular phones.  Wilson asked Ashley if she still has the "business" phone to which Ashley replied, "uh, yea, it's in the safe."  "Was I was supposed to get rid of it?," to which Wilson replied, "no," and that he (Wilson) just wanted to know if she still had it.  Wilson also asked Ashley if she still has the "Obama" phone.  Ashley replied that she also believed that phone is in the safe.

34.     During a separate jail call on August 5, 2023, Wilson asked Ashley for the phone number of "Jay's" niece.  Based on my involvement in this investigation, I believe "Jay" is a former inmate at the Cibola County Detention Center, where Wilson is currently incarcerated, who was recently released.  When Ashley was unable to locate the telephone number, Wilson told Ashley that phone numbers he (Wilson) gives her should be put in the safe, as he has told her before, because the numbers are important to Wilson.

35.     Based on the above jail phone call recordings, I believe the items stored in Wilson and Ashley's safe at Wilson's former and Ashley's current residence, including, but not limited to Wilson's cellular phones, are valuable enough to Wilson that he believes they should be kept in a safe.  I also believe that this means a cellular phone currently stored in the safe likely contains additional evidence or instrumentalities of Wilson's crimes, including Wilson's bay'ah video, which was not located on Wilson's cell phones seized on August 26, 2022.  My belief is based, in part, on my understanding that there is no reason to believe that these devices have any monetary or sentimental value such that Wilson would want them kept in a safe for such a reason, as well as my understanding, based on my training and experience, that individuals who

13

pledge bay'ah consider this pledge to be sacred and would likely wish to maintain proof of that

pledge. Further, I know based on my training and experience, that individuals who pledge

allegiance and provide material support to ISIS (or other terrorist organizations) often retain

evidence of their support and attempt to hide or conceal this evidence.

### Probable Cause to believe Evidence of the Crime Will Be Found
### In the Target Residence

#### *The Target Residence*

36.     There is probable cause to believe that investigators will find evidence of the

Subject Offenses within cellular phones or "smart" phones at the Target Residence including, but

not limited to, those located in the safe referenced by Wilson and Ashley during the recorded jail

calls described above. I know, based on my training and experience, that individuals who pledge

allegiance and provide material support to a FTO often retain evidence of their support in their

residence. In fact, items associated with Wilson's support for ISIS, including on cellular phones

and other electronic devices, were located and seized in the Target Residence during the search

executed on August 26, 2022. I further know, based on my training and experience that people

who provide material support to an FTO leave evidence of those attempts in electronic devices

and in other forms of records, such as the items set forth in Attachment B, at their residence.

Accordingly, I believe that Wilson communicated with members of his encrypted application

groups, to include CHS1, from his house using electronic devices located there. Indeed, CHS1

observed Wilson using electronic devices, to include cellular telephones, at the Target Residence

in connection with Wilson's attempts to promote ISIS. For example, according to CHS1, during

an in person recorded meeting on July 23, 2020, Wilson stated that, at that time, he had two cell

phones—one for personal use to make calls and a second one for "this stuff." Wilson also stated

that his second cellular phone was not activated with any specific telephone carriers but was used by Wilson to send ISIS videos to others via WiFi or Bluetooth.

37.     On September 21, 2020, Southwest Cyberport returned subscriber information in response to legal process indicating WiFi service existed at 13148 Wenonah Drive, Apt. D (the Target Residence), with Ashley Martinez listed as the account owner.  Furthermore, as described in more detail above, Wilson asked CHS1 to video-record Wilson's bay'ah oath on a cellular telephone and on various occasions, Wilson has shown ISIS-related videos to CHS1 on electronic devices in the Target Residence.

38.     Because Wilson spent the majority of his time at Target Residence, and from my training and experience, I believe that evidence of his motivation to support ISIS, activities done in support of ISIS, research and planning activities related to his attempt to provide material support, and online communications with others who similarly want to support ISIS will be found in cellular phones or smart phones Wilson used at the Target Residence as described below.  Moreover, the recorded calls between Wilson and Ashley, made while Wilson has been detained, confirm that additional cellular phones belonging to Wilson are currently kept in a safe in the Target Residence.

## TECHNICAL TERMS

39.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular
        telephone) is a handheld wireless device used for voice and data communication
        through radio signals.  These telephones send signals through networks of
        transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the telephone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and telephone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include Global Positioning System ("GPS") technology for determining the location of cellular telephones.

b. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images.

16

This storage media can contain any digital data, including data unrelated to photographs or videos.

d.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

e.   GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records of the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can

mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

40.     Based on my training, experience, and research, I know that smart phones have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players and GPS navigation devices.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

41.     Based on my knowledge, training, and experience, I know that electronic devices such as cellular telephones and smart telephones can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensic tools.

42.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how electronic devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that things that were once stored on a device may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or

18

years later using forensic tools.  This is so because when a person "deletes" a file

on a device, the data contained in the file does not actually disappear; rather, that

data remains on the device's storage medium until it is overwritten by new data.

b.  Based on my knowledge, training, and experience, I know devices can transfer

and back up data to other electronic devices by physical or electronic connections

(i.e., cloud based storage).

c.  Therefore, deleted files, or remnants of deleted files, may reside in free space or

slack space—that is, in space on the device's storage medium that is not currently

being used by an active file—for long periods of time before they are overwritten.

In addition, a device's operating system may also keep a record of deleted data in

a "swap" or "recovery" file.

d.  Wholly apart from user-generated files, computer storage media—in particular,

computers' internal hard drives—contain electronic evidence of how a computer

has been used, what it has been used for, and who has used it.  To give a few

examples, this forensic evidence can take the form of operating system

configurations, artifacts from operating system or application operation, file

system data structures, and virtual memory "swap" or paging files.  Computer

users typically do not erase or delete this evidence, because special software is

typically required for that task.  However, it is technically possible to delete this

information.

e.  Similarly, files that have been viewed via the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."

19

43.     Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the devices because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

20

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

44.     Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

45.     Based on the information described above, there is probable cause to believe that Wilson committed the Subject Offenses, and that evidence, fruits, and instrumentalities of the Subject Offenses will be found at the Target Residence on cellular telephones or smart phones found therein.

Respectfully submitted,

REDMOND OTT
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before
me on October 11, 2023:

UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### *Property to be searched*

The property to be searched is as follows:

1) The Target Residence, located at 13148 Wenonah Ave SE, Apartment D, Albuquerque, New Mexico, 87123 and may be described as a light grey and dark blue in color multi-family apartment complex with tan/orange trim.  The Target Residence is located on the second floor in building 13148 with the number "13148" visible on the North end of the building.  The letter "D" is visible on the door frame of the residence.  The Target Residence is a second-story apartment with windows on the north, west and south sides of the residence.



# **ATTACHMENT B**

## *Evidence to be seized*

The search of the property described in Attachment A shall include all records and information that may constitute evidence of criminal violations relating to 18 U.S.C. § 2339B, providing and attempting to provide material support to a designated foreign terrorist organization (hereinafter "FTO"), and Obstruction of Justice, in violation of 18 U.S.C. § 1512(c)(1) including:

1. All cellular telephones and smart telephones that may have been used as a means to commit criminal violations of, or contain evidence of, criminal violations relating to Title 18, United States Code, Section 2339B (Providing Material Support to a Designated Foreign Terrorist Organization), and Obstruction of Justice, in violation of 18 U.S.C. § 1512(c)(1).

2. For cellular telephones and smart telephones whose seizure is otherwise authorized by this warrant:

    a. Evidence of who used, owned, or controlled the electronic devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. Evidence of software that would allow others to control the cellular telephones, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. Evidence of the lack of such malicious software;

    d. Evidence of the attachments to the electronic devices or similar containers for electronic evidence;

    e. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic devices;

    f. Evidence of the times the electronic devices were used;

    g. Passwords, encryption keys, and other access devices that may be necessary to access the electronic devices;

2

h. Documentation and manuals that may be necessary to access the electronic devices or to conduct a forensic examination of the electronic devices;

i. Contextual information necessary to understand the evidence described in this attachment;

j. records and things evidencing the use of the Internet Protocol addresses including records of Internet Protocol addresses used;

k. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet or P2P search engine, and records of user-typed web addresses;

l. Communications evidencing the user's location and activities in the United States and elsewhere; communications to and from potential coconspirators, supporters or and facilitators for ISIS, or other armed groups; communications about the use of unlawful violence; communications evidencing destruction of evidence, evidence of other communications belonging to the subscriber; address books providing contact information for co-conspirators, supporters, facilitators or witnesses; or any other files, including photographs, videos, and text documents, describing the locations and activities of individuals fighting with or on behalf of ISIS or other armed groups.

m. Any text communications, messages, chats, or discussions including chat, voice, and typed text pertaining to providing, conspiring, and attempting to provide material support and resources to a designated foreign terrorist organization, including ISIS;

n. All images, video content, image files, video files, text files, archive files and any other uploaded files, attachments or Internet links pertaining to the providing, conspiring, and attempting to provide material support and resources to a designated foreign terrorist organization, including ISIS, or the destruction of evidence thereof.

o. All posted text communications, chats, discussions, and public postings that further the recruitment of individuals to provide, conspire to provide, and attempt to provide material support and resources to a designated foreign terrorist organization, including ISIS;

p. Evidence indicating the user's state of mind as it relates to the criminal violations under investigation (identified above).

3

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.